[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This case was tried to the court over a period of 6 days. Both parties were represented by experienced trial counsel who each called several witnesses and introduced numerous exhibits. Both parties filed post-trial briefs.
The dispute arises out of a written agreement in which the plaintiff, Roosevelt Building Products Co., Inc., agreed to sell certain assets to the defendant, Morin Corporation. The plaintiff claims that the defendant took more assets than were included in the sale. The plaintiff's complaint is in three counts: conversion, unjust enrichment, and CUTPA. There is no claim for breach of contract.
The plaintiff is a family corporation consisting of Roosevelt Morin ("Mr. Morin") and his four children. In a factory in Thomaston they manufactured steel and aluminum panels for walls, decks and roofs for large commercial, industrial and military buildings. They also erected the panels they manufactured. Because of financial problems, the plaintiff decided to sell the assets of their manufacturing business but not their erection equipment. They intended to erect a building on land they owned in Cromwell and continue in the business of erecting metal panels.
In March 1999 Mr. Morin made personal contact with Ilhan Eser ("Mr. Eser"), the president of the defendant, Morin Corporation. Morin Corporation is one of about 25 manufacturing companies owned by an international parent company named Metecno International. Morin Corporation had once been owned by Mr. Morin and other members of his family. The plaintiff and defendant had done business with each other over the years.
Mr. Morin showed Mr. Eser around the Thomaston facility as well as the Cromwell property where some manufacturing assets and erection equipment were stored in trailers. During this view of the assets, Mr. Morin told CT Page 1911 Mr. Eser that the erection equipment, stored in two trailers at the Cromwell property, was not for sale. This comment was made in passing and Mr. Eser does not remember it. But this is not unexpected because the defendant is not in the erection business and Mr. Eser had no reason to make any particular note of the erection equipment or of Mr. Morin's comment. He knew that he could make good use of the manufacturing equipment and was anxious to try to negotiate a favorable price. He had no reason to want to purchase equipment used in the erection business.
Mr. Morin and Mr. Eser agreed upon a $1,150,000 price for the manufacturing assets and turned the matter over to their lawyers to prepare the necessary paperwork. The lawyers negotiated the language of the purchase and sale agreement, the property schedule, and an agreement containing non-disclosure covenants and a covenant not to compete. Mr. Morin was actively involved in these negotiations; Mr. Eser was not. These documents all support the proposition that this was a sale of manufacturing equipment, not erection equipment. In the purchase and sale agreement the defendant is described as intending to use the assets in connection with its business of fabricating pre-engineered wall panels. The fixed assets are described as including machinery, furniture, office equipment, fixtures, molds, tools and dies wherever located, as specifically set forth in the property schedule, "excluding any erection equipment which is not on site." Also excluded from the sale were" (i) obsolete inventory and (ii) steel columns which Seller intends to use such items [sic] in Seller's project in Cromwell, Connecticut." The property schedule consists of two separate appraisals. One of these appraisals actually listed erection equipment originally, but this equipment was X'ed off the final version. The second appraisal lists only the following items which could be considered erection equipment: 15 gang boxes and 1 Miller welder.
The parties differ over the meaning of the phrase "excluding any erection equipment which is not on site." But the evidence taken as a whole indicates that "site" refers to the Thomaston manufacturing plant, not the Cromwell land where the plaintiff intended to build a new facility. Therefore, the erection equipment stored on the Cromwell property was not included in the sale.
Although Mr. Morin was concerned that the documentation be clear that the erection equipment was to be excluded from the sale, Mr. Eser seems to have given it no real notice. He was only interested in the manufacturing equipment and in getting it integrated into the defendant's operations as soon as possible. It is clear that Mr. Eser, a busy man with far flung responsibilities, never realized that the erection equipment was excluded from the sale. As a result, he never informed his CT Page 1912 subordinates that they should be careful to avoid commingling the erection equipment with the manufacturing equipment. This turned out to be a problem because the line between manufacturing equipment and erection equipment is blurry. Many items including seamers, saws, and welders are useful in both businesses.
After the closing the defendant arranged to have the manufacturing equipment stored on the Cromwell property delivered to its facility in Bristol. However, the defendant's employees removed all of the property stored in Cromwell including the two trailers of erection equipment as well as 51,700 square feet of rusted roof panels and 71 purlins which the plaintiff intended to use in the construction of the new building in Cromwell. A purlin is a kind of carrying beam. The defendant stored the trailers in the rear yard of the Bristol facility where they still remain. It is clear that the defendant's employees who moved the trailers and dealt with the equipment stored on them had no idea that the erection equipment still belonged to the plaintiff. They treated it as if it were included in the sale. Some of the equipment, including 22 gang boxes, was unloaded from one of the trailers. All of the equipment, including scaffolding, remained stored on the other trailer. When Mr. Morin realized that the erection equipment had been moved, he contacted the defendant to find out what was going on. The employees who talked to Mr. Morin seemed to have placated him by saying that they would look into it. However, the employees believed that Mr. Morin was incorrect in his assertion that he still owned the erection equipment. Thus, they took no action to investigate his claims.
Mr. Morin tried unsuccessfully to contact Mr. Eser several times to try to discuss the matter with him. Finally, in July 2000, Mr. Morin wrote to Mr. Eser demanding to be paid $165,841.75 for the erection equipment. He enclosed a list of equipment with estimated values. This list contains some obvious errors such as the inclusion of two pickup trucks. Mr. Eser and his employees who looked at the letter never took it seriously because of the obvious errors. Eventually Mr. Morin was able to schedule a meeting with Mr. Eser. At this brief meeting Mr. Eser denied that Mr. Morin had any valid claim but told him that he was welcome to take back any of the erection equipment still in the yard because the defendant did not need it. Mr. Eser said that the defendant would not pay the plaintiff's monetary demand without a law suit. Soon thereafter the plaintiff commenced suit.
The plaintiff had insurmountable difficulty proving the contents of the two trailers containing the erection equipment. Prior to and during the litigation the plaintiff provided the defendant with several different lists of erection equipment allegedly located on the two trailers. These CT Page 1913 lists changed as the plaintiff added and removed items. The lists even changed during the trial. The contents of the gang boxes on the trailers has not been established by a fair preponderance of the evidence. The plaintiff asks the court to draw the inference that these gang boxes contain the same items shown on a bill of lading prepared by the plaintiff's employee when erection equipment was shipped from South Carolina to Thomaston in May 1998 at the completion of a large project. The court is unable to draw this inference for the following reasons: 1) when the equipment arrived in Thomaston from South Carolina, it was unpacked. No inventory was done. During the unpacking, at least three of the boxes were found to be empty. 2) Before the equipment was loaded on the two trailers and shipped to Cromwell at least some of it, including some of the more valuable items, was removed by Mr. Morin's sons and brought to their homes or to other job sites. The evidence of exactly what was removed was not reliable. 3) After the two trailers were shipped to Cromwell it sat in the unguarded trailers. More items were removed by Mr. Morin's sons. The court is not confident as to the identity of these items. 4) After the defendant moved the trailers to its Bristol facility, some more items were removed by at least one of Mr. Morin's sons. Again, the court is unable to rely on the evidence of the items removed. 5) The lists of items offered by Mr. Morin to substantiate his loss are unreliable. For example, the earlier lists contained an entry for "6 Hi-Lo lifts each with two model drills" valued at $44,073. This was the largest single item on the lists. The evidence is clear that there were no Hi-Lo lifts on the trailers. Mr. Morin could have determined this fact from the beginning of this dispute by talking to his former 25-year employee, Robert Rinkavage, who loaded the trailers. That Mr. Morin was so careless about such a large item leaves the court with little confidence in his lists of much smaller items. Therefore, the court is unwilling to draw inferences based upon the South Carolina bill of lading that particular items (with the exception of the items still in the possession of the defendant) were on the trailers when they were taken into the possession of the defendant.
The defendant admitted that it had possession of some erection equipment still on the trailers or in the gang boxes. There is swing scaffolding equipment and ladder picks used in the erection business still on one of the trailers. Both parties offered appraisers who testified as to the value of this equipment. The value of this equipment at the time of the conversion is found to be $7,500. The two trailers were not included in the sale. They had a value of $2,000 and $1,200. The gang boxes and contents had a value of $2,525.
Attention must be given to the claim that the defendant converted 51,700 square feet of rusted roofing panels and 71 steel purlins which CT Page 1914 the plaintiff intended to use to build a building in Cromwell. The purchase and sale agreement provides that the defendant is to receive all of the plaintiff's finished goods and merchandise, "excluding (i) obsolete inventory and (ii) steel columns which Seller intends to use such items [sic] in Seller's project in Cromwell, Connecticut." The plaintiff argues that the panels and purlins which the defendant removed from the Cromwell property are the "obsolete inventory" and "steel columns" to be used in the Cromwell project. The defendant argues that the panels and purlins are finished goods and merchandise which it purchased from the plaintiff.
The plaintiff's claim for conversion of the purlins and panels has some problems which must be mentioned. When Mr. Morin contacted Mr. Eser in July 2000 his 2-page letter made no mention of the panels and purlins. They were not included on the attached list of converted equipment with a stated value of $165,841.75. They were not included on subsequent lists until a disclosure response made in April 2002 after the case had been pending for many months. Although it is odd that Mr. Morin would have neglected to include items which he now claims to be worth $56,000-$58,000, it seems to fit into the disorganized way in which Mr. Morin presented his claim to the defendant. In spite of these problems with the claim, the evidence supports a finding that the panels and the purlins are the "obsolete inventory" and "steel columns" excluded from the sale.
The panels and the purlins were all manufactured by the plaintiff. Mr. Morin testified that it cost $8,000-$10,000 to manufacture the purlins and $48,000 to manufacture the panels. In a disclosure filed in April 2002 the plaintiff stated that the estimated value of both items was "in excess of $30,000." The defendant sold the panels as irregular goods because they were rusted. The defendant used some of the purlins and still has some of them. The value of the purlins and panels at the time of the conversion is found to be $30,000.
The plaintiff sets forth three causes of action in its complaint, only one of which, the First Count for conversion, provides a basis for relief under the facts of this case. Extended discussion of the other two counts is not necessary. The Second Count for unjust enrichment is not applicable to these facts because this equitable remedy applies only when "justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract." Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.,231 Conn. 276, 282 (1994). "The fact that the plaintiff could not recover under the contract does not bar its recovery under the theory of unjust enrichment; indeed, lack of a remedy under the contract is a precondition CT Page 1915 for recovery based upon unjust enrichment." Id. at 284. In this case, there was a contract on which suit could have been brought to provide a remedy to the plaintiff. For some reason the plaintiff never brought a suit for breach of contract. But the availability of the remedy for breach of contract makes unjust enrichment inapplicable.
The Third Count is a CUTPA claim. General Statutes § 42-110b (a) provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." "It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the federal trade commission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise . . . (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three . . . Moreover, this court has set forth a three part test for satisfying the substantial injury criterion: [1] [the injury] must be substantial; [2] it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and [3] it must be an injury that consumers themselves could not reasonably have avoided . . ." (Citations omitted; internal quotation marks omitted.) Murray v. Taylor, 65 Conn. App. 300,337-38, 782 A.2d 702, cert. denied, 258 Conn. 928, 783 A.2d 1029 (2001). The facts of this case do not lend themselves to a finding that the defendant engaged in immoral, unethical, oppressive or unscrupulous behavior, or behavior which offends public policy as it has been established by statutes, common law or otherwise. The defendant's lack of responsiveness in handling this claim was caused, in large part, by Mr. Morin's inaccurate and ever-changing lists of missing items.
The First Count sets forth a cause of action for conversion and for treble damages pursuant to General Statutes Section 52-564. Conversion requires proof of an unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights. Falker v. Samperi, 190 Conn. 412, 419 (1983). The measure of damages in conversion is the value of the property at the time of the conversion. Healey v. Flammia, 96 Conn. 233, 235 (1921). The facts of this case support recovery for the conversion of the two trailers, the swing scaffolding and ladder picks still in the trailers, the 22 gang boxes and contents, and the purlins and the panels. The plaintiff proved ownership of this property together with an unauthorized assumption and CT Page 1916 exercise of the right of ownership by the defendant to the exclusion of the plaintiff's rights. The total value of this property at the time of the conversion is $43,225.
The First Count also seeks recovery under General Statutes Section 52-564
entitled "Treble Damages for Theft." That section provides: "Any person who steals any property of another, or knowingly receives and conceals stolen property, shall pay the owner treble his damages." Statutory theft under this section is synonymous with larceny under Section 52-564 of the General Statutes and requires proof that 1) the property held by the defendant belonged to the plaintiff, 2) the defendant intentionally deprived the plaintiff of the property, 3) the defendant's conduct was unauthorized. See, Discover Leasing Inc. v. Murphy, 33 Conn. App. 303,309 (1993). "Conversion can be distinguished from statutory theft as established by Section 53a-119 in two ways. First, statutory theft requires an intent to deprive another of his property; second, conversion requires the owner to be harmed by the defendant's conduct. Therefore, statutory theft requires a plaintiff to prove the additional element of intent over and above what he or she must demonstrate to prove conversion." Lawson v. Whitney's Frame Shop, 42 Conn. App. 599, 605-06
(1996), rev'd on other grounds, 241 Conn. 678 (1997). "In addition, a plaintiff must satisfy a higher standard of proof, namely, clear and convincing evidence, in order for the trial court to award treble damages pursuant to Section 52-564 while it is ordinarily sufficient in civil cases to prove the existence of a criminal act by a preponderance of the evidence." (Interior quotation marks and citations omitted.) Id. at note 8. The evidence does not support a finding that the defendant intentionally deprived the plaintiff of its property. The original removal of the property to the defendant's property in Bristol resulted from a misunderstanding of the terms of the agreement. The inability to resolve the matter thereafter resulted, primarily, from the rather sloppy manner in which Mr. Morin presented his claim to the defendant. The defendant did not have the intent necessary to find statutory theft.
Judgment may enter for the plaintiff to recover of the defendant the sum of $43,225 plus costs.
John W. Pickard
Judge of the Superior Court CT Page 1917